UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


WHITE RIVER AMUSEMENT PUB, INC.,    :
                    Plaintiff,      :
                                    :
    v.                              : File No. 1:02-CV-320
                                    :
TOWN OF HARTFORD, VERMONT;          :
THE SELECTBOARD OF HARTFORD,        :
VERMONT; HUNTER RIESEBERG, as the   :
Town Manager of Hartford, Vermont;  :
TODD STEADMAN, as Chairman,         :
Selectboard of the Town of          :
Hartford, Vermont; LEONARD          :
BERLINER, GAYLE OTTMAN,             :
RAY CERASOLI, and RICHARD BALLOU,   :
as Members of the Selectboard,      :
Town of Hartford, Vermont; and      :
JOSEPH ESTEY, as Chief of Police    :
of Hartford, Vermont,               :
                    Defendants.     :
                                    :
_____ :


RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT
(Papers 42, 58, and 78)

    The Town of Hartford, Vermont, the Selectboard of Hartford,

Vermont, and Hunter Rieseberg, Todd Steadman, Leonard Berliner,

Gayle Ottman, Ray Cerasoli, Richard Ballou, and Joseph Estey,

individually ("Defendants"), request a grant of summary judgment

on all claims brought by Plaintiff, White River Amusement Pub,

Inc. ("Plaintiff"), under Fed. R. Civ. P. 56.  Plaintiff, in

turn, requests that the Court grant summary judgment on its

claims in their entirety against Defendants.  For the reasons

stated herein, the Defendants' motion is DENIED in part and

GRANTED in part.  Plaintiff's motion is GRANTED in part and
DENIED in part.


BACKGROUND

Plaintiff began operating the White River Amusement Pub
("the WRAP"), located in downtown White River Junction within the
Town of Hartford, Vermont in September 2001.  The WRAP serves
food and beverages, and provides music and dance entertainment
performed by women who are sometimes clothed, sometimes topless,
and sometimes completely nude.  Pl.'s Statement of Undisputed
Facts (Paper 59) ¶ 3.  At the time the WRAP commenced operation,
the Town had no ordinance to prohibit the WRAP from providing
nude dance entertainment.

In Spring 2002, at the request of the Selectboard, the
Town's Attorney, Robert Manby, Jr., researched and prepared a
draft of a public indecency ordinance.  During the drafting
process, Attorney Manby considered similar local ordinances
adopted by other Vermont towns.  Upon completing the draft and
sending it to the Selectboard for review, Attorney Manby
recommended that they adopt a resolution stating that they had
considered the "secondary effects" of adult entertainment as part
of the enactment process.  Paper 59, Ex. R.  Attorney Manby
apparently based his recommendation on the fact that this Court,
in upholding a similar ordinance in SBC Enterprises, Inc. and

<u>Shawn B. Cliche v. City of South Burlington</u>, 892 F. Supp. 578 (D. Vt. 1995), had taken into account whether the legislative body had considered the negative secondary effects of public nudity in passing the ordinance.

Despite this advice from Attorney Manby, the Selectboard did not adopt a statement describing any perceived negative secondary effects that the indecency ordinance was intended to address. During consideration and discussion of the ordinance at two meetings in April 2002, the Selectboard reviewed only the draft ordinance, two letters from Attorney Manby, and similar ordinances previously enacted in other Vermont towns.  Paper 59 ¶ 12; Defs.' Objections to Pl.'s Statement of Undisputed Material Facts (Paper 65) ¶ 12.  The Town Manager and some Selectboard members apparently also discussed potential negative secondary effects with constituents.  Paper 65 ¶ 14.

After a brief public hearing on May 28, 2002 at which the Town Manager gave "an overview" of the ordinance, the Selectboard adopted the Town of Hartford Public Indecency Ordinance ("the Ordinance") by a unanimous vote.  Paper 59 ¶¶ 7-9; Paper 65 ¶ 6. The Ordinance provides:

> "Nudity" shall mean the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering (which fully opaque covering shall not be a facsimile designed to replicate or imitate the covered area), or the showing of the female breast with less than a fully opaque covering (which fully opaque covering shall not be a facsimile designed to replicate or imitate the covered area) of any

portion of the nipple or the depiction of covered male genitals in a discernibly turgid state.  A woman breastfeeding her child, irrespective of whether her breast is covered, shall not be considered in a state of nudity.

The Ordinance defines "Public Place" as "any location frequented by the public," including "business and commercial establishments,. . . night clubs,. . . [and] cabarets."   The Ordinance also states, in pertinent part:

> a.   No person shall knowingly or intentionally in a public place:
>   1.   engage in sexual intercourse;
>   2.   appear in a state of nudity;
>   3.   fondle his/her genitals;
>   4.   fondle the genitals of another person;
>   5.   fondle his/her breasts; or
>   6.   fondle the breasts of another person.
>
> b.   No person who owns, leases, or controls property shall knowingly allow any person to engage in the conduct described in subparagraph a. above at any time such property is open to the public.

Subsequent to enacting the Ordinance, the Town received studies documenting negative secondary effects of adult businesses, and also held a public hearing at which the Selectboard members articulated their rationale for enacting the Ordinance -- to combat the negative secondary effects of public nudity.  Paper 65 ¶ 14; Defs.' Reply Mem. of Law in Further Supp. of Joint Mot. for Summ. J. (Paper 61) at 6-7, Ex. E.

Plaintiff argues that the Ordinance violates its protections under the First, Fourteenth, and Fifth Amendments.  In addition, Plaintiff claims Defendants' conduct violates 42 U.S.C. § 1983,

as well as Chapter 1, Article 13 and Chapter 1, Article 7 of the
Vermont Constitution.  Finally, Plaintiff asserts that the
individual Defendants cannot claim qualified, legislative, or
statutory immunity.

Plaintiff cites for support the undisputed fact that the
Town of Hartford did not personally conduct a study of potential
negative secondary effects that nude entertainment might have
upon the Hartford community, and that at no time during pre-
enactment hearings and meetings did the Hartford Selectboard
discuss possible negative secondary effects.  Paper 59 ¶¶ 5-9,
12-16; Paper 65 ¶¶ 6-7.

Defendants, in turn, argue that the Ordinance meets
constitutional standards under the First, Fourteenth, and Fifth
Amendments, as well as under Chapter 1, Article 13 and Chapter 1,
Article 7 of the Vermont Constitution.  Finally, the individual
Defendants assert that they are entitled to qualified,
legislative, or statutory immunity.


## DISCUSSION

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is
appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment

as a matter of law." <u>World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins.</u>, 345 F.3d 154, 165 (2d Cir. 2003).  The burden is on the moving party to demonstrate there are no material facts genuinely in dispute.  <u>See</u> <u>Feingold v. New York</u>, 366 F.3d 138, 148 (2d Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)).  When ruling on a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the party opposing the motion.  <u>Johnson v. Wright</u>, 412 F.3d 398, 403 (2d Cir. 2005).

I.   <u>Mootness</u>

As a preliminary matter, the Court must address the justiciability question.  Defendants argue that the case is moot because Plaintiff no longer operates the WRAP due to a fire during the pendency of the current motions.  Defs.' Feb. 2005 Mem. of Law in Supp. of Mot. for Summ. J. (Paper 79); Defs.' Feb. 2005 Local Rule 7.1(c) Statement of Undisputed Material Fact (Paper 80).

A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 287 (2000); <u>Michele Catanzano, et al. v. Brian J. Wing and Barbara A. Debuono</u>, 277 F.3d 99, 107 (2d Cir. 2001) (both quoting <u>County of Los Angeles v. Davis</u>, 440 U.S. 625, 631 (1979)).  The root

concern is that, when the conduct at issue ceases such that
"there is no reasonable expectation that the wrong will be
repeated," then it becomes impossible for the court to grant
"'any effectual relief whatever' to [the] prevailing party."
Pap's A.M., 529 U.S. at 287 (quotations and citations omitted);
see also Fox, 42 F.3d at 140.

Here, Plaintiff submitted an affidavit stating that it
intends to "continue to provide the same dance entertainment . .
. when the WRAP reopens," and possibly at other locations as
well.  Affidavit of Daniel Garr (Paper 83) ¶¶ 10-11 (citing the
WRAP's lease which is in effect until July 15, 2006).
Plaintiff's claims, therefore, are not moot; there is a
reasonable expectation that upon the WRAP's re-opening, the Town
would enforce the Ordinance, subjecting Plaintiff to the same
substantial harm.  See Pap's A.M., 529 U.S. at 287 (holding that
"simply closing [the nude dancing establishment] is not
sufficient to render the case moot, however.  Pap's is still
incorporated under Pennsylvania law, and it could again decide to
operate a nude dancing establishment in Erie"); Clark v. City of
Lakewood, 259 F.3d 996, 1012 (9th Cir. 2001) (holding that
plaintiff still had "a legally cognizable interest in the
outcome" of its case challenging an adult cabaret ordinance where
plaintiff's license to operate cabarets had expired but he
intended to reopen his business); Calise Beauty Sch. v. Richard

Riley, Sec'y of the U.S. Dep't of Educ., 1997 U.S. Dist. LEXIS
15706, *13, No. 6501 (S.D.N.Y. 1997) (Stein, J.) (holding that a
challenge to an agency policy that would likely subject the
litigants to the same dispute again was not moot); Begins v.
Philbrook, 513 F.2d 19, 23 (2d Cir. 1975) ("the [Vermont welfare]
Regulation still stands and defendant clearly intends to enforce
it against plaintiffs should the occasion demand.").

The case is not moot since the WRAP continues to face a
threat of future harm when the Town enforces the Ordinance.
Therefore, Defendants' motion for summary judgment on that ground
is DENIED.  Now to the merits.


II.  Freedom of Expression

Plaintiff claims that the nude dance entertainment provided
at the WRAP is protected expression under the First Amendment.
Being in a state of nudity is not an inherently expressive
condition.  The Supreme Court has consistently held, however,
that nude dancing of the type at issue here is expressive conduct
that falls within the outer ambit of the First Amendment's
protection.  Pap's A.M., 529 U.S. at 289; see also Barnes v. Glen
Theatre, Inc., 501 U.S. 560, 565-566 (1991); Schad v. Mount
Ephrahim, 452 U.S. 61, 66 (1981) ("nude dancing is not without
its First Amendment protections").  Thus, municipal ordinances
that regulate nude dancing are subject to constitutional

8

scrutiny.  See, e.g., Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Fla., 337 F.3d 1251, 1269 (11th Cir. 2003) (citing Pap's A.M., 529 U.S. at 289-90); see also SBC Enters., Inc., 892 F. Supp. at 581 (citing Barnes, 501 U.S. at 569).

To determine what level of scrutiny applies to the ordinance at issue, the Court must determine whether Hartford's Ordinance is related to the suppression of expression.  Pap's A.M., 529 U.S. at 289.  "If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the 'less stringent' standard from O'Brien for evaluating restrictions on symbolic speech." Id. at 289 (citing United States v. O'Brien, 391 U.S. 367, 377 (1968), articulating the test for evaluating government regulation of conduct involving both "speech" and "nonspeech" elements, in the context of draft card burning).  Because the Ordinance bans all nudity within Hartford and does not specifically target expressive nude dancing, it is a facially neutral ordinance, and therefore the Court will evaluate it under the four-factor test for expressive conduct set forth in O'Brien, 391 U.S. 367, 376-77.  See SOB, Inc. v. County of Benton, 317 F.3d 856, 862 (8th Cir. 2003); Heideman, et al. v. South Salt Lake City, 348 F.3d 1182, 1197 (10th Cir. 2003); Peek-A-Boo Lounge, 338 F.3d at 1269 (all applying O'Brien test to public nudity ordinances).

Under <u>O'Brien</u>, an ordinance is valid if (1) the government regulation is within the constitutional power of the government; (2) the regulation furthers an important or substantial government interest; (3) the government interest is unrelated to the suppression of free speech; and (4) the restriction is no greater than is essential to the furtherance of the government interest.  <u>O'Brien</u>, 391 U.S. at 376-77.

A.   <u>The First and Fourth O'Brien Factors</u>

The Ordinance meets the first and fourth <u>O'Brien</u> factors. Regarding the first factor, there is no doubt that the Ordinance is within the government's lawful powers.  <u>See</u> <u>Pap's A.M.</u>, 529 U.S. at 296 (the city's "efforts to protect public health and safety are clearly within the city's police powers"); <u>Barnes</u>, 501 U.S. at 567.

The fourth factor of the <u>O'Brien</u> test requires that any incidental restriction on alleged First Amendment freedoms be no greater than essential to further the government's interest.  The plurality in <u>Pap's A.M.</u> concluded that an absolute ban on nudity meets the <u>O'Brien</u> test because "the requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message."  <u>Pap's A.M.</u>, 529 U.S. at 301.  The same conclusion can be reached here, and therefore the Ordinance meets <u>O'Brien</u>'s fourth factor.

B.    The Second and Third O'Brien Factors

The third O'Brien factor -- whether the government interest is unrelated to the suppression of free expression -- follows from the second -- regarding whether the Ordinance's purpose furthers an important government interest.  It appears that the third factor is satisfied here because the Selectboard has subsequently stated that its interest in passing the Ordinance was to prevent the secondary negative effects associated with nude adult entertainment, not merely to suppress erotic expressive speech.  Mr. Steadman has stated that, as Chair of the Selectboard, "I put the ordinance on the agenda because of my desire to protect economic development opportunities within the Town," and at a September 9, 2002 public hearing, the Selectboard stated its rationale for enacting the Ordinance, based on the potential for negative secondary effects. Aff. of Todd Steadman (Paper 45) at ¶¶ 13-14; Paper 65 at ¶ 14.

It is the related second factor, however, that is problematic.  See, e.g., SOB, Inc., 317 F.3d at 862-63. Defendants assert that the Selectboard enacted the Ordinance to combat negative secondary effects.  To satisfy the second O'Brien factor, however, the Town of Hartford must demonstrate that the Ordinance furthers the Town's substantial interest in preventing the secondary effects associated with adult entertainment. O'Brien, 391 U.S. at 377; see also Pap's A.M., 529 U.S. at 296-97

11

(citing <u>Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 51-52 (1986)).  The precise issue is the quality and quantum of evidence a government body must consider at the time of enactment to demonstrate it has a reasonable basis for believing the regulated activity creates negative secondary effects.  Because the evidentiary standard continues to evolve, we address it in some depth.  <u>See</u> <u>Alameda Books</u>, 529 U.S. at 311 (Souter, J., concurring in part and dissenting in part) (noting that the Court has never precisely addressed how much evidence is required).

     1.   <u>The Applicable Standard</u>

The Supreme Court's secondary effects jurisprudence is riddled with a number of no-clear-majority decisions.  <u>See</u> <u>Peek-A-Boo Lounge</u>, 337 F.3d at 1255-65 (comprehensively summarizing the Supreme Court's secondary effects jurisprudence).  The current standard, however, for deciding whether an ordinance furthers the government's alleged interest in combating the negative secondary effects associated with sexually oriented speech in general, and nude dancing in particular, is described in <u>Renton</u> and utilized in <u>Barnes</u>, <u>Pap's A.M.</u>, and <u>Alameda Books</u>.

According to the standard first set out in <u>Renton</u>,

> The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is <u>reasonably believed to be relevant</u> to the problem that the city addresses.

12

Renton, 475 U.S. at 51-52 (emphasis added).  The government need not produce actual proof that its remedy reduces secondary effects; the Supreme Court has held that such a requirement "would go too far in undermining our settled position that municipalities must be given a reasonable opportunity to experiment with solutions" to address the secondary effects of protected speech.  Alameda Books, 535 U.S. at 433, 439 (quoting Renton, 475 U.S. at 52).

A government, however, cannot "get away with shoddy data or reasoning.  The municipality's evidence must fairly support the municipality's rationale for its ordinance." Alameda Books, 535 U.S. at 438 (plurality opinion) (granting certiorari to clarify this standard);[1] see also R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402, 409 (7th Cir. 2004) (quoting Justice Kennedy's concurrence in Alameda Books that "a municipality must advance some basis to show that its regulation has the purpose and effect of suppressing undesirable secondary effects") (emphasis added). If plaintiffs succeed in casting doubt on a municipality's rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence

---

[1] Alameda Books addressed the standard in the context of a zoning ordinance.  Although zoning and public nudity ordinances are evaluated under different tests -- Renton and O'Brien, respectively -- the standard discussed in Alameda Books applies to a similar prong in each test, regarding whether the ordinance "furthers" or "serves," respectively, the government's alleged interest in combating negative secondary effects.  See Peek-A-Boo Lounge, 337 F.3d at 1264-65 (clarifying this distinction).

that disputes the municipality's factual findings, the burden
shifts back to the municipality to supplement the record with
evidence renewing support for a theory that justifies its
ordinance.  <u>Alameda Books</u>, 535 U.S. at 438-39 (citing <u>Pap's A.M.</u>,
529 U.S. at 298).  <u>See</u> <u>Peek-A-Boo Lounge</u>, 337 F.3d at 1265
(reversing summary judgment granted to county because plaintiff
cast doubt upon county's rationale for its public nudity
ordinance, thus shifting the burden to county to supplement the
record with supporting evidence); <u>SOB, Inc.</u>, 317 F.3d at 862-64
(8th Cir. 2003) (holding that the county had sufficient basis for
concluding that public indecency ordinance was needed to further
governmental interest in combating secondary effects where the
county gathered studies by other municipalities and evidence of
adverse effects, including testimony by a former strip-club
manager); <u>Flanigan's Enters., Inc. of Ga. v. Fulton County, Ga.</u>,
242 F.3d 976, 986 (11th Cir. 2001) (finding it unreasonable for
the county to rely on foreign studies concerning secondary
effects when the county's own current data conclusively
demonstrated that such effects were not found).

Finally, while the "reasonably believed to be relevant"
evidentiary standard is not particularly demanding, neither the
Supreme Court nor circuit courts have found it satisfied by a low
level of justification.  <u>See</u> <u>R.V.S.</u>, 361 F.3d at 411-12 ("<u>Compare</u>
<u>Alameda Books</u>, 535 U.S. at 425, 122 S. Ct. 1728 (city relied on

14

study it conducted a number of years prior to enacting
ordinance); Renton, 475 U.S. at 44, 106 S. Ct. 925 (planning
committee conducted extensive studies and hearings); G.M.
Enters., 350 F.3d at 631 (town board collected 16 studies and
consulted judicial opinions and police reports); Ben's Bar, 316
F.3d at 725 (village board relied on numerous judicial decisions,
studies from 11 different cities, and findings in a report from
the state's attorney general); Schultz v. City of Cumberland, 228
F.3d 831 (7th Cir. 2000) (city collected and reviewed studies and
conducted legislative research); DiMa Corp., 185 F.3d at 830-31
(town "minimally" met its evidentiary burden by relying on the
factual record supporting the experience of another community as
reported in a judicial opinion).").

    In short, the second O'Brien factor requires that Defendants
demonstrate that the Selectboard, in enacting the Ordinance,
relied upon evidence reasonably believed to be relevant to the
problem of negative secondary effects, and the evidence fairly
supports the Selectboard's rationale for the Ordinance.

    Defendants assert that they do not have to provide such
evidentiary support, in reliance upon this Court's earlier
decision in SBC Enterprises v. City of South Burlington, 892 F.
Supp. 578 (D. Vt. 1995).  In SBC Enterprises, Judge Gagliardi
upheld South Burlington's public nudity ordinance, which is quite
similar to the Ordinance at issue here, except that it makes

explicit reference to consideration of secondary effects. Id. at 582 n.3. After identifying the O'Brien standard, Judge Gagliardi reasoned that "this Court need not engage in an analysis of the Ordinance beyond reference to Justice Souter's opinion" in Barnes, since the regulations in Barnes and South Burlington were identical. Id. at 582. Judge Gagliardi also noted that the municipality's interest in secondary effects need only be a current interest, and need not be articulated at the time of enactment, citing Barnes. Id.; see also Barnes, 501 U.S. at 584 (holding that Indiana could reasonably rely on the findings and experiences of other similar localities in order to conclude that forbidding nude dancing furthered its interest in preventing secondary effects, in satisfaction of O'Brien's second factor).

Reliance on SBC Enterprises, however, is misplaced in light of more recent secondary effects jurisprudence. First, in Pap's A.M., Justice Souter recanted his position in Barnes[2] upon which Judge Gagliardi relied in SBC Enterprises. Justice Souter explained in Pap's A.M. that

> [i]n several recent cases, we have confronted the need
> for factual justifications to satisfy intermediate
> scrutiny under the First Amendment. . . . Those cases
> do not identify with any specificity a particular
> quantum of evidence, nor do I seek to do so in this
> brief concurrence. What the cases do make plain,
> however, is that application of an intermediate

---

[2] Because Justice Souter provided the narrowest grounds for the judgment in Barnes, his concurrence constitutes the holding of the Court in that case under the rule of Marks v. United States, 430 U.S. 188, 193 (1977), for interpreting fragmented Supreme Court decisions.

> scrutiny test to government's asserted rationale for
> regulation of expressive activity demands some factual
> justification to connect that rationale with the
> regulation in issue.

529 U.S. at 311 (Souter, J., concurring in part and dissenting in

part).  He further stated that because the <u>Barnes</u> Court did not

address evidentiary showings, "[t]o invoke Barnes, therefore,

does not indicate that the issue of evidence has been addressed."

<u>Id.</u> at 315.  Justice Souter noted that his partial dissent

> rests on a demand for an evidentiary basis that I
> failed to make when I concurred in <u>Barnes</u>. . . .
> [A]fter many subsequent occasions to think further
> about the needs of the First Amendment, I have come to
> believe that a government must toe the mark more
> carefully than I first insisted.

<u>Id.</u> at 316.

    In another development since <u>SBC Enterprises</u>, the Supreme

Court clarified <u>Renton</u>'s requirement that a municipality act on

evidence "reasonably believed to be relevant" to the problem of

secondary effects does not mean "that a municipality can get away

with shoddy data or reasoning.  The municipality's evidence must

fairly support the municipality's rationale for its ordinance."

<u>Alameda Books</u>, 535 U.S. at 439.

    Finally, recent federal case law explicates the inference in

<u>Renton</u> that it requires pre-enactment evidence.[3]   <u>See Peek-A-Boo</u>

---

    [3]  As quoted above at page 13, the <u>Renton</u> Court stated that "[t]he First
Amendment does not require a city, <u>before enacting such an ordinance</u>, to
conduct new studies or produce evidence independent of that already generated
by other cities, so long as whatever evidence the city relies upon is
reasonably believed to be relevant to the problem the city addresses."  475
U.S. at 51-52 (emphasis added).

Lounge, 337 F.3d at 1268 (noting that the majority of circuit courts interpret Renton to require at least some pre-enactment evidence) (citing Hickerson v. City of New York, 146 F.3d 99, 105 (2d Cir. 1998) ("a barren legislative record will not suffice under the First Amendment") and 11126 Baltimore Blvd. v. Prince George's County, 886 F.2d 1415, 1425 (4th Cir. 1989) ("Clearly, trial testimony and 'supplemental' materials cannot sustain regulations where there is no evidence in the pre-enactment record.")).[4]  The Peek-A-Boo Lounge Court additionally reasons that in Alameda Books, the Court resolved the argument that Los Angeles could not reasonably rely on post-enactment evidence "not by finding respondents' argument inapposite, as would be appropriate if Renton did not require pre-enactment evidence, but by noting that Los Angeles had, in fact relied on pre-enactment evidence."  337 F.3d at 1268, n.17.

In conclusion, the second O'Brien factor requires a demonstration from the Selectboard that, at the time it enacted the Ordinance, it relied upon at least some evidence reasonably believed to be relevant to its interest in preventing negative secondary effects associated with nude adult entertainment, and

---

[4]  Defendants cite BGHA v. City Universal City, 340 F.3d 295, 298 (5th Cir. 2003) for the proposition that municipalities may justify an ordinance either by pre- or post-enactment evidence.  The BGHA Court cited as support, however, a case that cites to Justice Souter's re-canted position in Barnes. Id. at 299 (citing J&B Entm't, Inc. v. City of Jackson, 152 F.3d 362, 371 (5th Cir. 1998)).  Notably, the ordinances in both BGHA and J&B Entm't included preambles describing the municipalities' concern for negative secondary effects.  See BGHA, 340 F.3d at 298; J&B Entm't, 152 F.3d at 365.

that the evidence fairly supported its rationale for the
Ordinance.

    2.  <u>Application of the Standard</u>

Before enacting the Ordinance, the Hartford Selectboard
considered only (1) public indecency ordinances from the City of
Rutland, City of South Burlington, and Essex Junction, (2) two
letters from Town Attorney Manby, including his indication that
this Court upheld a similar statute in <u>SBC Enterprises</u>, and (3)
the Town Manager's "overview" of the Ordinance.  Paper 59 ¶¶ 6-
15; Paper 65 ¶¶ 6, 8, 12.  Although some Selectboard members
discussed negative secondary effects with constituents, the
Defendants concede that they did not discuss secondary effects
during the pre-enactment meetings and public hearing.  Paper 65
¶¶ 6, 8, 14.  The Board did not undertake a study of potential
secondary effects, nor consider other municipalities' studies
until after enactment.  Paper 65 ¶ 15.  Despite specific advice
from Attorney Manby, the Selectboard also did not adopt a
resolution describing any perceived secondary effects that the
Ordinance was intended to address.  Not until September 2002 did
the Selectboard publicly explain its rationale for the Ordinance.
Paper 65 ¶ 14; Paper 61 at 6-7.

Plaintiff presented the following evidence in support of its
motion for summary judgment:  Defendants Steadman and Ottman
testified under oath that they are not aware of any adverse
secondary effects caused by the WRAP since its opening in

September 2001.  Paper 59 ¶¶ 20, 23, Exs. U, X.  Mr. Steadman
also testified that he is unaware of an increase in crime and a
number of new businesses have opened in the direct vicinity of
the WRAP and existing businesses have moved to the area in which
the WRAP is located.  Paper 59 ¶¶ 21,22, Exs. V, W.  Defendant
Berliner added that the WRAP has not had a negative effect on
commercial property rental and sales values.  Paper 59 ¶ 24, Ex.
Y.  Police Chief Estey testified that he has written reports of
criminal activity that can be attributed to the entertainment
provided by the WRAP and a greater number of complaints and
police attention were attributable to the pool hall that operated
before the WRAP.  Paper 59 at ¶ 25, Ex. AA.  Finally, local
business owners have testified the WRAP has not negatively
affected their downtown businesses.  Paper 59 ¶ 27, Ex. BB.

     Because Plaintiff provided evidence rebutting the
Defendants' rationale for enacting the ordinance, the burden
shifts to the Defendants to add evidentiary support to their
theory of negative secondary effects.  Alameda Books, 535 U.S. at
438-439.  In response, Defendants rely upon a portion of Mr.
Steadman's 2004 affidavit, stating that he was "concerned that
permitting public nudity . . . created a potential for the
creation of negative secondary effects," and he was "aware" that
other cities and towns had studied the issue of "the creation of
negative secondary effects."  Paper 45, Ex. B.  Mr. Steadman's
statements, however, are the sort of post-enactment justification

that courts have rejected.  See R.V.S., 361 F.3d at 405-06, 411
(finding it questionable that a modest amount of support,
consisting of two legislators' personal observations and evidence
of higher than average prostitution at a particular intersection,
would be sufficient under the permissive guidelines); Peek-A-Boo
Lounge, 337 F.3d at 1268 (invalidating ordinance in light of
insufficient secondary effects evidence because the evidence
required is "pre-enactment" evidence); see also 11126 Baltimore
Blvd., 886 F.2d at 1425 ("Clearly, trial testimony and
'supplemental' materials cannot sustain regulations where there
is no evidence in the pre-enactment record.").

Defendants additionally rely upon Attorney Manby's letter
alerting them to the decision in SBC Enterprises, upholding a
similar ordinance.  Paper 45 ¶ 12.  The Peek-A-Boo Lounge court,
however, noted that such a passing reference to a judicial
opinion is insufficient to satisfy the government's evidentiary
burden.  337 F.3d at 1267.  Moreover, there is no evidence the
Selectboard members read SBC Enterprises or other judicial
opinions.  See DiMa Corp. v. Town of Hallie, 185 F.3d 823, 830-31
(7th Cir. 1999) (town "minimally" met its evidentiary burden by
relying on the factual record supporting the experience of
another community as reported in a judicial opinion).

Defendants also cite for support meeting minutes showing
that the Town Manager gave "an overview" of the draft ordinance
to the Selectboard before enactment.  Paper 65 ¶¶ 6, 8.  The

court in Gazarkiewicz v. Town of Kingsford Heights, Ind., 359
F.3d 933, 946 (7th Cir. 2004), gave town meeting minutes
substantial weight; "they are contemporaneous, official notations
regarding council action . . . [and] they are more reliable than
post hoc justifications given by the council members in
deposition testimony once they are aware they are being sued."
The minutes of meetings on April 30, 2002 and May 28, 2002 fail
to indicate that the Selectboard considered secondary negative
effects during their deliberations.

Finally, Defendants emphasize the fact that several months
after enacting the Ordinance, the Selectboard held a public
hearing on the Ordinance at which they articulated their
rationale for enactment, and also received multiple studies
documenting the negative secondary effects of adult business --
although Defendants make no effort to relate the studies to the
potential for secondary effects in Hartford.  Paper 45 ¶¶ 4-5;
Paper 61 at 6-7, Ex. E.  Contrary to Defendants' arguments,
however, case law suggests that they must demonstrate they relied
on at least some pre-enactment evidence to support their
rationale for enacting the Ordinance to combat negative effects.
See supra at pp. 19-20.  In fact, Defendants' pre-enactment
evidence of its consideration of secondary effects falls short of
that proffered in other cases in which there were findings that
O'Brien's second factor had been satisfied.  See R.V.S., 361 F.3d
at 411-12 (summarizing cases with higher levels of pre-enactment

evidence); Center for Fair Pub. Policy v. Maricopa County, 336
F.3d 1153, 1166-68 (9th Cir. 2003) (holding that although the
"pre-enactment record is a slim one" consisting of letters
documenting problems associated with sexually oriented businesses
and a "fact sheet" citing fourteen studies from other locales
with secondary effects associated with adult entertainment, the
record was sufficient); Peek-A-Boo Lounge, 337 F.3d at 1268
(finding the county had satisfied its pre-enactment burden by
showing it had relied on two reports regarding secondary effects
but that challengers had cast doubt on the "speculative,"
"outdated" studies).  Defendants' post-enactment evidence of its
rationale does not make up for its failure to rely on pre-
enactment evidence that "fairly supports the municipality's
rationale."  Alameda Books, 535 U.S. at 438.

As in Alameda Books, this Court acknowledges that "courts
should not be in the business of second-guessing fact-bound
empirical assessments of city planners."  Alameda Books, 535 U.S.
at 451.  The purpose of the evidentiary standard clarified in
Alameda Books, however, is to require municipalities to
demonstrate reasonable reliance on some evidence supporting their
concern for the secondary effects.  R.V.S., 361 F.3d at 409
(quoting Justice Kennedy's concurrence in Alameda Books that "a
municipality must advance some basis to show that its regulation
has the purpose and effect of suppressing undesirable secondary

effects"); see also Hickerson, 146 F.3d at 105 ("a barren legislative record will not suffice under the First Amendment").

In conclusion, Hartford's Public Indecency Ordinance fails to meet the second part of the O'Brien test because the Town has not shown that it furthers the substantial government interest of preventing the negative secondary effects associated with nude adult entertainment.  Because the Hartford Ordinance does not satisfy the second part of the O'Brien test, the Ordinance violates Plaintiff's First Amendment right to free expression, and is therefore unconstitutional.

III. Prior Restraint

Plaintiff alleges the Ordinance constitutes a prior restraint on its right to free speech.  Plaintiff's challenge does not qualify under the specialized exception for "prior restraints on speech" because it does not involve a permitting or licensing scheme or other prior review but instead an after-the-fact enforcement.  United States v. Frandsen, 212 F.3d 1231, 1236-37 (2000) (defining prior restraint as "when the government can deny access to a forum for expression before the expression occurs") (citing Ward v. Rock Against Racism, 491 U.S. 781 (1989)).  Therefore, the Hartford Public Indecency Ordinance does not constitute an impermissible prior restraint on Plaintiff's right to free expression.  Plaintiff's prior restraint claim is dismissed.

24

IV.  Equal Protection

Plaintiff alleges the Hartford Public Indecency Ordinance is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.  "For a case to be deemed justiciable under Article III, it must be ripe."  Marchi v. Bd. of Coop. Educ. Servs., 173 F.3d 469, 478 (2d Cir. 1999).  The injury or threat to the Plaintiff must be both "real and immediate," and not "conjectural."  O'Shea v. Littleton, 414 U.S. 488, 494 (1974).  Although the Ordinance has been in effect since May 28, 2002, the Town has not yet enforced it against the WRAP.  To this end, the Plaintiff has failed to prove it was singled out for discriminatory treatment by the police.  See Reilly v. Doyle, 483 F.2d 123, 128 (2d Cir. 1973).  Because Plaintiff is unable to show an injury in fact, its equal protection claim is not ripe for adjudication and is dismissed.


V.  Regulatory Taking

Plaintiff alleges the mere enactment of the Ordinance has deprived the WRAP of all economically viable uses of its property.  Anything less than a complete elimination of value may still be considered a regulatory taking by taking into account the Ordinance's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectation, and the character of the government action. Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001).  However,

25

only if and when the Ordinance is implemented could there arguably be any change in Plaintiff's viable economical use. Cranley v. Nat'l Life Ins. Co. of Vt., 144 F. Supp. 2d 291, 302 (D. Vt. 2001).  Even assuming the Ordinance had been enforced, Plaintiff's claim for an unconstitutional taking still fails because Plaintiff retains a "full 'bundle' of property rights;" the destruction of one "strand" of the "bundle", nude dancing, is not a taking.  Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302 (2002) (quoting Andrus v. Allard, 444 U.S. 51, 66 (1979)).  Therefore, Plaintiff's claim of an unconstitutional taking pursuant to the Fifth Amendment of the Constitution is dismissed.[5]

VI.  Vermont Constitution

The U.S. Constitution is not the only foundation of Plaintiff's claims; he also cites the guarantees of the Vermont Constitution, specifically Chapter I, Article 7, the Common Benefits Clause, and Chapter I, Article 13, recognizing the right to freedom of speech.

The Vermont Supreme Court has suggested that "the right of free speech guaranteed under Chapter I, Article 13 is coextensive with the First Amendment," although it has reserved final judgment on the issue.  State v. Read, 690 A.2d 944, 951 (Vt.

---

[5]  The fact that Plaintiff no longer operates the WRAP due to the fire during the pendency of the current motions does not affect this result.

26

1996) (citing <u>Shields v. Gerhart</u>, 658 A.2d 924, 929 (Vt. 1995)
and <u>In re Morrissey</u>, 538 A.2d 678, 689 (Vt. 1987)).  Because the
Vermont Supreme Court has not yet determined if Article 13
provides greater protection than the First Amendment, and because
the Court found the Hartford Public Indecency Ordinance
unconstitutional under the U.S. Constitution, the Court finds the
Ordinance unconstitutional under Article 13.


VII. <u>Immunity</u>

Plaintiff concedes its state law claims are barred against
Individual Defendants because Vermont law grants immunity to all
appointed or elected municipal officials.  <u>See</u> Paper 51 at 9-10;
24 V.S.A. § 901(a) (2004).  Therefore, this Court will consider
only the federal law claims against the Individual Defendants.

As to all claims, a subclass of the Individual Defendants,
consisting of Chairman Todd Steadman and Town Selectboard members
Leonard Berliner, Gayle Ottman, Ray Cerasoli, and Richard Ballou
("Legislative Defendants"), argues that all claims are barred by
either the doctrine of qualified immunity or legislative
immunity.[6]  The remaining two defendants, Hunter Rieseberg, as
Town Manager, and Chief of Police Joseph Estey, were not
personally involved in the enactment of the Ordinance at issue in

---

[6]  Municipalities do not enjoy either absolute or qualified immunity
from suit under Section 1983. <u>Leatherman v. Tarrant County Narcotics
Intelligence & Coordination Unit</u>, 507 U.S. 163, 166 (1993).

this case, and request summary judgment on all of Plaintiff's civil rights claims against them.

Local legislators are entitled to absolute immunity from civil liability under Section 1983 for their legislative activities.  Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998); Berlickij v. Town of Castleton, 248 F. Supp. 2d 335, 342 (D. Vt. 2003).  This "immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'"  Bogan, 523 U.S. at 54 (quoting Tenney v. Brandhove, 341 U.S. 367, 376 (1951)).  The Town of Hartford Selectboard is the legislative body of the town.  See 24 V.S.A. § 2001 (2004).  Local legislators are entitled to absolute immunity from federal damages liability for the activity of legislating.  Berlickij, 248 F. Supp. 2d at 342.  They are also entitled to absolute liability from state damages liability.  Id. at 343; Levinsky v. Diamond, 559 A.2d 1073, 1079 (Vt. 1989), overruled on other grounds by Muzzy v. State, 583 A.2d 82 (Vt. 1990).  The test for determining whether an act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it."  Bogan, 523 U.S. at 55.  The claim of an unworthy purpose is legally irrelevant and does not destroy the privilege.  Id.

All of Plaintiff's damages claims arise from the Town of Hartford's enactment of the Public Indecency Ordinance, effectuated by the Legislative Defendants.  The Selectboard held a public hearing about the Ordinance, voted upon and enacted the

Ordinance.  The Legislative Defendants' actions bear the essence of traditional legislative activity and "reflected a discretionary, policymaking decision implicating the . . . priorities of the town." Bogan, 523 U.S. at 55-56.  Legislative immunity must be afforded to the Legislative Defendants because their enactment of the Public Indecency Ordinance was a purely legislative function.  Therefore, summary judgment must be GRANTED in favor of the Legislative Defendants on all of Plaintiff's damages claims against them. However, the Legislative Defendants are not immune from the injunctive and declaratory relief sought by the WRAP, and therefore summary judgment is DENIED in favor of the Plaintiffs with respect to injunctive and declaratory relief.

Because the Legislative Defendants qualify for legislative immunity, the Court does not have to reach the question of qualified immunity for them.

The remaining Defendants, Town Manager Rieseberg and Chief of Police Estey, are both executive municipal officers and have no legislative powers or duties.  See 24 V.S.A. §§ 1235-38 (town manager); 24 V.S.A. § 1931(b) (municipal police chief). Therefore, Defendants Rieseberg and Estey were not personally involved in the Ordinance's enactment.  See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §

1983.").  Because this Court finds that the Ordinance violates
Plaintiff's First Amendment right to free expression, Defendants
Rieseberg and Estey will not have the opportunity to enforce the
Ordinance and, therefore, cannot become personally involved in
any constitutional deprivation pursuant to Section 1983.
Defendants Rieseberg and Estey's motion for summary judgment is
GRANTED with respect to any damages claim.  The injunctive and
declaratory relief given by this Court will be enforceable
against Defendants Rieseberg and Estey; therefore, their motion
for summary judgment is DENIED with respect to all injunctive and
declaratory relief.


                            CONCLUSION

     For the reasons stated herein, Defendants' motion for
summary judgment on the grounds of mootness is DENIED.
Plaintiff's motion for summary judgment is GRANTED to the extent
this Court finds the Hartford Public Indecency Ordinance violates
Plaintiff's First Amendment right to free expression.
Plaintiff's motion for summary judgment is DENIED with respect to
Plaintiff's Equal Protection, Regulatory Taking, and all Vermont
Constitutional claims.  Defendants' motion for summary judgment
is DENIED to the extent it requests a finding of
Constitutionality of the Ordinance.  The Individual Defendants'
motion for summary judgment is GRANTED with respect to all

                               30

damages claims, and is DENIED with respect to all injunctive and declaratory relief.

SO ORDERED.

Dated at Brattleboro, Vermont, this 15th day of December, 2005.

/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge